UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SHERRILLYN THEANELDA GRANT,**<br><br>**Plaintiff,**<br><br>v.<br><br>**KILOLO KIJAKAZI,**<br>**Acting Commissioner of Social Security,**<br><br>**Defendant.** | No. 21-cv-00526-ZMF |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Sherrillyn Theanelda Grant moves for reversal of Defendant Commissioner of the Social Security Administration's decision adopting the findings of an Administrative Law Judge ("ALJ") and denying her application for Social Security Disability Insurance Benefits ("DIB"). *See* Pl.'s Mot. J. Rev., ECF No. 16.  Defendant Commissioner moves for affirmance.  *See* Def.'s Mot. J. Affirmance, ECF No. 17.  Ms. Grant identifies two errors in the ALJ's findings: (1) that, in determining Ms. Grant's residual functional capacity ("RFC"), the ALJ violated the "treating physician rule" by assigning only "some weight" to the opinion of Dr. Elizabeth Nolte, M.D.; (2) that the ALJ failed to account for the effect that Ms. Grant's limitation in head movements would have on the availability of occupations she could perform in the national economy.  Having considered the parties' submissions and the Administrative Record,[1] and for the reasons set forth below, the Court will GRANT Plaintiff's motion for a judgment of reversal, remand this matter to

---

[1] The Administrative Record consists of ten exhibits.  *See* ECF No. 11.  For ease of reference, citations to the Administrative Record will refer to the "AR" and cite to the consecutive page numbers provided in the lower right-hand corner of each page.

the Commissioner for further proceedings, and DENY Defendant's motion for a judgment of affirmance.

I. **BACKGROUND**

   A. <u>Statutory Framework</u>

The Social Security Act (the "Act") provides DIB for "disabled" individuals. 42 U.S.C. § 423(a)(1). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). The impairment must be severe and must render the individual unable to perform both "previous work" and "any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B); *see* 20 C.F.R. § 416.905.

The Social Security Administration ("SSA" or "Commissioner") uses a five-step sequential process to determine whether a claimant is disabled. *See* 20 C.F.R. § 416.920(a)(4). If a determination can be made at any step, the SSA does not go on to the next step. 20 C.F.R. § 416.920(a)(4). The burden of proof is borne by the claimant at each of the first four steps and switches to the Commissioner at step five. *See Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004) (citing 20 C.F.R. §§ 404.1520, 416.920). At step one, the claimant must demonstrate she is not presently engaged in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). At step two, the claimant must show that she has a "severe" medically determinable impairment that "significantly limits [her] physical or mental ability to do basic work activities." *Id.* § 416.920(a)(4)(ii). At step three, the claimant must show that her impairment—or combination of impairments—"meets or equals" the criteria of an impairment listed in the SSA Commissioner's regulations. *Id.* § 416.920(a)(4)(iii). If the claimant's impairment does not meet or equal a listed

impairment, the Commissioner proceeds to step four, which requires the Commissioner to determine the claimant's RFC and whether, in light of the RFC, the claimant can still perform any relevant past work. *See id.* §§ 416.920(a)(4)(iv), 416.920(e)–(f). If the RFC indicates that the claimant cannot engage in past work, then at step five, the ALJ looks to the claimant's RFC, age, education, and past work experience to determine if she can perform "other work" in the national economy. *See id.* §§ 416.920(a)(4)(v), 416.920(g).

    B.    Factual Background

        1.    *Ms. Grant's Testimony and Reports*

Ms. Grant has a master's degree in business and previously worked as an administrative assistant, health care worker, worker for a housing development company, veteran specialist, and Army logistics specialist. *See* AR 14–16, 19, 144. Ms. Grant's alleged disability began on November 22, 2015—when she left her job as an administrative assistant—due to degenerative disc disease of the lumbar spine, bipolar disorder, and depression. *See* AR 143–44.

In July 2016, Ms. Grant reported that she "applied for several employment opportunities." AR 1099. In February 2017, Ms. Grant reported that she was "able to dress, bathe, and groom herself, cook and prepare food, do general cleaning, do her laundry, shop, manage her money, and use public transportation whenever she need[ed] to . . . and [went] out to walk the dog whenever she fe[lt] like it." AR 566. In March 2017, Ms. Grant reported that she cooked once or twice a week, did laundry twice a month, shopped two to three times a month, showered every other day, dressed daily, and went out to walk the dogs. *See* AR 569. In August 2018, Ms. Grant reported that she was trying to lose weight by swimming. *See* AR 868–69.

At her hearing, Ms. Grant testified that she had a driver's license but no longer drove. *See* AR 13–14. Instead, she used public transportation as her primary method of transportation. *See* AR 14. She also testified that she had "lost all the support in [her] neck." AR 27.

2. *Medical Evidence*

On January 10, 2016, Kimberly Seablom, PA-C, examined Ms. Grant using a Department of Veterans Affairs "Neck (Cervical Spine) Conditions Disability Benefits Questionnaire." AR 364–72. PA Seablom's examination revealed forward flexion of 30 degrees, extension of 45 degrees, lateral flexion of 30 degrees on the right and 30 degrees on the left, and rotation of 60 degrees bilaterally in Ms. Grant's cervical spine. *See* AR 366. PA Seablom noted that Ms. Grant had "abnormal" initial range of motion and "localized tenderness or pain on palpation" of the trapezius and cervical region, but that the abnormal range of motion did not "contribute to a functional loss." AR 366. After observing Ms. Grant's repeated use, PA Seablom recorded "additional loss of function or range of motion" that "significantly limit[ed] functional ability." AR 366–67. PA Seablom also noted that "regardless of repetitive use," Ms. Grant herself did not "report having any functional loss or functional impairment of the cervical spine." AR 365. Finally, PA Seablom concluded that Ms. Grant's cervical spine condition did not "impact . . . her ability to work" and she maintained "functional capacity for sedentary work." AR 371. On December 5, 2016, an exam by Dr. Philip Marion, M.D., recorded Ms. Grant's "functional status" as "[i]ndependent with [activities of daily living] and ambulation." AR 1034–36.

On March 8, 2017, Dr. Elizabeth Nolte, M.D., examined Ms. Grant. *See* AR 568–71. Dr. Nolte observed that Ms. Grant could walk on her toes and heels without difficulty, squat one-third of the way, "[u]sed no assistive devices[,] [n]eeded no help changing for exam or getting on and off exam table[, and was] [a]ble to rise from chair without difficulty." AR 569. Dr. Nolte's

4

physical examination of Ms. Grant's cervical spine showed flexion of 45 degrees, extension of 10 degrees, lateral flexion of 30 degrees on the right and 15 degrees on the left, and rotation of 45 degrees bilaterally. *See* AR 570. Dr. Nolte diagnosed Ms. Grant with degenerative disc disease, chronic neck and back pain, headaches, and a history of anxiety with panic attacks. *See* AR 571. She also determined that Ms. Grant had "mild limitation in squatting and . . . *moderate limitation* in bending, *head movements* and reaching. She should avoid frequent bending and heavy lifting." AR 571 (emphasis added).

In September 2017, an MRI of Ms. Grant's cervical spine revealed evidence of "[s]traightening of the cervical lordosis with multilevel degenerative disease and facet arthrosis . . . at [the] C6-C7 with moderate bilateral neural foraminal narrowing and moderate central stenosis." AR 948–50. On February 20, 2018, Dr. Daniel Morgan, M.D., noted that Ms. Grant had "new subjective weakness" and neck pain, as well as that she "would also benefit from a cervical pillow for neck rest." AR 914.

      C.      <u>Procedural Background</u>

On August 9, 2016, Ms. Grant filed an application for DIB. *See* AR 38. Her alleged disability began on November 22, 2015. *See* AR 39. On March 20, 2017, the SSA denied Ms. Grant's claim. *See* AR 72–75. Ms. Grant subsequently filed a request for a hearing before an ALJ, which was held on July 24, 2019. *See* AR 8.

On March 30, 2020, ALJ Michelle Allen denied Ms. Grant's claim. *See* AR 54–68. At step one, the ALJ found that Ms. Grant "ha[d] not engaged in any substantial gainful activity since November 22, 2015, the alleged [disability] onset date." AR 57. At step two, the ALJ determined that she "ha[d] the following severe impairments: depressive disorder, generalized anxiety, bipolar affective disorder, lumbar degenerative disc disease with radiculopathy, cervical stenosis, and

5

obesity."[2]  AR 57.  At step three, the ALJ considered Ms. Grant's impairments under listings 1.04 (disorders of the spine), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders) and determined that she "d[id] not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  AR 57–59.

The ALJ next determined that Ms. Grant had the RFC to "perform light work as defined in 20 CFR 404.1567(b)," with some limitations.[3]  AR 59.  In formulating the RFC, the ALJ relied on the opinions of medical professionals who examined Ms. Grant, Ms. Grant's own statements, and her medical records.  *See* AR 59–66.  The ALJ determined that Ms. Grant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ."  AR 60.  In particular, the ALJ found that Ms. Grant's testimony about her daily life was inconsistent with her claims about the limiting effects of her symptoms.  AR 66.  The ALJ gave "limited weight" to opinions in the notes from the Department of Veterans Affairs and "some weight" to the opinion of Dr. Nolte.  *See* AR 64–65.

---

[2] Plaintiff has only raised physical impairments related to her cervical spine—and not mental health impairments—as an issue on appeal.  *See* Pl.'s Mot. J. Rev. at 6–9.

[3] These limitations included that Ms. Grant "[wa]s able to climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, stoop occasionally, never kneel, crouch occasionally, never crawl, can never work at unprotected heights, never moving mechanical parts and never operating a motor vehicle, [wa]s able to perform simple, routine tasks; able to make simple work-related decisions; [wa]s able to occasionally interact with co-workers and the public; [and wa]s able to tolerate occasional changes in a routine work setting."  AR 59.

Based on her determination of Ms. Grant's RFC and testimony of the vocational expert ("VE"), Andrew Pasternak, the ALJ found in step four that Ms. Grant was "unable to perform any relevant past work." *See* AR 66.  At step five, however, the ALJ found that—considering Ms. Grant's age, education, work experience, and RFC—jobs nevertheless existed in "significant numbers in the national economy that [she] could perform." *See* AR 67.  The VE testified that an individual with Ms. Grant's characteristics could perform the requirements of representative occupations such as (i) inspector and hand packager, (ii) assembler of small parts, and (iii) lens matcher.  *See* AR 68.

The ALJ concluded that a "finding of 'not disabled' [wa]s therefore appropriate . . . ." AR 68.  On December 22, 2020, the SSA Appeals Council denied Ms. Grant's request for review. *See* AR 1–3.  Ms. Grant now seeks review of the SSA's determination that she was not disabled, arguing that that the ALJ erred at steps four and five.  *See* Pl.'s Mot. J. Rev. at 6–9.  On September 30, 2021, District Judge Carl J. Nichols referred this action to a Magistrate Judge for all purposes. *See* Minute Order (Sept. 30, 2021).

## II.     LEGAL STANDARD

A district court sits in what is essentially an appellate role when it reviews the Commissioner's disability determination, which must be upheld "if it is supported by substantial evidence and is not tainted by an error of law." *Smith v. Bowen*, 826 F.2d 1120, 1121 (D.C. Cir. 1987).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Butler*, 353 F.3d at 999 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  This standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315

F.3d 362, 365–66 (D.C. Cir. 2003) (quoting *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002)).

"Substantial-evidence review is highly deferential to the agency fact-finder . . . ." *Rosello ex rel. Rosello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008). "An ALJ's credibility determinations, in particular, 'are entitled to great deference . . . .'" *Harrison Cnty. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 790 Fed. App'x 210, 212 (D.C. Cir. 2019) (quoting *Sec'y of Labor v. Keystone Coal Mining Corp.*, 151 F.3d 1096, 1107 (D.C. Cir. 1998)). "The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment 'concerning the credibility of the evidence with its own.'" *Goodman v. Colvin,* 233 F. Supp. 3d 88, 104 (D.D.C. 2017) (quoting *Crosson v. Shalala*, 907 F. Supp. 1, 3 (D.D.C. 1995)). But this deference requires that the ALJ build a "logical bridge" between the evidence and her conclusions so that this Court may "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 67 (D.D.C. 2006) (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).

On review, the "plaintiff bears the burden of demonstrating that the Commissioner's decision [was] not based on substantial evidence or that incorrect legal standards were applied." *Settles v. Colvin*, 121 F. Supp. 3d 163, 169 (D.D.C. 2015) (quoting *Muldrow v. Astrue*, No. 11-cv-1385, 2012 WL 2877697, at *6 (D.D.C. July 11, 2012)). If the ALJ is found to have applied the correct legal standards and met the substantial evidence threshold, the reviewing court may grant the Commissioner's motion for an affirmance of the disability determination. *See, e.g.*, *Hicks v. Astrue*, 718 F. Supp. 2d 1, 17 (D.D.C. 2010). If a court finds error in an ALJ's determination that a claimant was not disabled, it may reverse and remand, requiring the SSA to conduct further

proceedings consistent with the law. *See, e.g.*, *Jackson v. Barnhart*, 271 F. Supp. 2d. 30, 38 (D.D.C. 2002).

**III.   ANALYSIS**

Ms. Grant challenges the ALJ's decision on two grounds: (1) in assessing Ms. Grant's RFC, the ALJ failed to give Dr. Nolte's opinion controlling weight as prescribed under the "treating physician rule;" and (2) the ALJ failed to account for the effect that Ms. Grant's limitation in head movements would have on the availability of occupations she could perform in the national economy. *See* Pl.'s Mot. J. Rev. at 6–9.

    A.   <u>The ALJ's RFC Assessment and the Treating Physician Rule</u>

        1.   *Legal Standard*

In making an RFC determination, an ALJ must consider "all of the relevant evidence" and "must explain how [s]he considered and resolved any 'material inconsistencies or ambiguities' evident in the record, as well as the reasons for rejecting medical opinions in conflict with the ultimate RFC determination." *Butler*, 353 F.3d at 1000 (citing *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P (S.S.A. July 2, 1996)). Under the regulations in force at the time Plaintiff filed her claims, medical opinions by an individual's treating physicians "are entitled to 'controlling weight' if they are not inconsistent with other substantial record evidence and are well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at 1003 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).[4]

---

[4] These regulations were eliminated for claims filed after March 27, 2017, and replaced with new standards for the evaluation of opinion evidence. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). "The D.C. Circuit has not addressed whether its treating physician rule survives the change in the SSA's regulations," however courts have "assume[d] that it does." *Melanie A. S. v. Kijakazi*, No. 21-cv-185, 2022 WL 1721196, at *10 n.15 (D.D.C. May 12, 2022), *report and recommendation adopted*, 2022 WL 1718987 (D.D.C. May 27, 2022).

The treating physician rule acknowledges that "[b]ecause a claimant's treating physicians have great familiarity with [her] condition, their reports must be accorded substantial weight." *Id.* (quoting *Williams v. Shalala*, 997 F.2d 1494, 1498 (D.C. Cir. 1993)). When evaluating the weight of a treating physician's opinion, the ALJ should consider six factors: (1) the "length of the treating relationship and frequency of examination," (2) the "nature and extent of the treating relationship," (3) the "supportability" of the opinion, (4) the "consistency" of the opinion with other record evidence, (5) the physician's specialization, and (6) any "other factors that tend to support or contradict the medical opinion." *See Butler*, 353 F.3d at 1003 n.7 (citing 20 C.F.R. §§ 404.1527(d)(2)–(6), 416.927(d)(2)–(6)). But the ALJ does not have to reference each of these factors when justifying her decision. *See Matthews v. Saul*, 2020 WL 5440573, No. 18-cv-1110, at *1 (D.D.C. Sep. 10, 2020) (citing *Grant v. Astrue*, 857 F. Supp. 2d 146, 154–55 (D.D.C. 2012)).

An ALJ who rejects a treating physician's opinion, however, must "explain [her] reasons for doing so." *Williams*, 997 F.2d at 1498 (citing *Simms v. Sullivan*, 877 F.2d 1047, 1052–53 (D.C. Cir. 1989)). Generally, "citations to contradictory evidence are sufficient explanation for an ALJ's decision to discount the medical opinion of a treating physician." *Matthews*, 2020 WL 5440573, at *1 (citing *Grant*, 857 F. Supp. 2d at 154).

2.  *Dr. Nolte's Opinion Regarding Limitation in Head Movements*

Dr. Nolte opined that Ms. Grant that had "moderate limitation in bending, head movements, and reaching." AR 571. The ALJ afforded Dr. Nolte's opinion "some weight as [Ms. Grant]'s severe impairments result in functional limitations and the opinion is consistent with the evidence in the record as a whole, including positive diagnostic tests and clinical examination findings." AR 64. The ALJ determined these impairments caused an impact on "postural limitations" and "limitations on carrying and lifting." AR 64. In regard to "limitations for head movements"

specifically, however, the ALJ determined that there was "no support in the record" and that "clinical examination findings d[id] not record abnormal range of motion of the cervical spine." AR 64.  Ms. Grant contends that the ALJ neither afforded the proper weight to Dr. Nolte's opinion nor gave an appropriate explanation as to why.  *See* Pl.'s Mot. J. Rev. at 6–9.

The ALJ assigned "some weight" to Dr. Nolte's opinion without even a passing reference to other medical opinions.  AR 64.  However, to reject the opinion of a treating physician "requires that the ALJ at least 'note[] the contradictory evidence in the record.'"  *Williams v. Berryhill*, 268 F. Supp. 3d 46, 53 (D.D.C. 2017) (citing *Jones v. Astrue*, 647 F.3d 350, 356 (D.C. Cir. 2011)). The ALJ's assertion that "there is no support in the record for limitations for head movements" did not cite any evidentiary support or address Dr. Nolte's contradictory opinion.  *See* AR 64. Reversal is appropriate in such circumstances.  *See Lane-Rauth*, 437 F. Supp. 2d at 67 (reversing ALJ's decision where, contrary to the requirement that the ALJ "at least minimally discuss a claimant's evidence that contradicts the Commissioner's position," the ALJ simply concluded that "there [was] absolutely no evidence in the record . . . .") (quoting *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000)).

"While the applicable authorities provide for a deferential standard of review, remand is warranted where an ALJ mischaracterizes evidence that was presented."  *Stubbs v. Saul*, No. 18-cv-01457, 2020 WL 1893173, at *6 (D.D.C. Mar. 23, 2020), *report and recommendation adopted*, 2020 WL 1891979 (D.D.C. Apr. 15, 2020) (citing *Porter v. Colvin*, 951 F. Supp. 2d 125, 136 (D.D.C. 2013)).  The ALJ's determination that there was "no support" for Dr. Nolte's opinion and "clinical examination findings d[id] not record abnormal range of motion of the cervical spine," AR 64, mischaracterizes the evidence for three reasons.

First, the benefits questionnaire recorded that Ms. Grant in fact had an "abnormal" initial range of motion in her cervical spine. *See* AR 365–66. According to the questionnaire, full range of motion allows forward flexion of 45 degrees, extension of 45 degrees, right and left lateral flexion of 45 degrees, and right and left lateral rotation of 80 degrees. *See* AR 366. PA Seablom's examination showed forward flexion of 30 degrees, extension of 45 degrees, right and left lateral flexion of 30 degrees, and bilateral rotation of 60 degrees. *See id.* PA Seablom recorded that the abnormal initial range of motion itself did not "contribute to a functional loss." AR 366. After repeated use, however, PA Seablom recorded "additional loss of function or range of motion" that did "significantly limit functional ability." AR 366–67. PA Seablom also noted that "regardless of repetitive use," Ms. Grant did not "report having any functional loss or functional impairment of the cervical spine," AR 365, and that her "cervical spine (neck) condition" did not impact "her ability to work," AR 371. The ALJ only afforded "limited weight" to this questionnaire because "the determination of service related disability [wa]s not comparable to the determination of disability under Social Security rules and regulations." AR 65. Any legal difference between what qualifies as a service-related disability and one for the SSA, however, does not undermine the relevance of the underlying medical evidence presented by the results of Ms. Grant's tested range of motion in her cervical spine. "[T]he outcome of the case depends on the demonstration of the functional limitations of the disease or impairment rather than the mere diagnosis of the disease or name of the impairment." *Davis v. Berryhill*, 272 F. Supp. 3d 154, 177 (D.D.C. 2017) (quoting *McKean v. Colvin*, 150 F. Supp. 3d 406, 417 (M.D. Pa. 2015)). The ALJ failed to otherwise evaluate this medical evidence or explain how it factored into her decision to afford less weight to Dr. Nolte's opinion.

Second, Dr. Nolte's opinion was informed by her own clinical examination, which the ALJ failed to reference. *See* AR 64, 568–571. Dr. Nolte's examination revealed reduced range of motion since Ms. Grant's examination fourteen months prior. *Compare* AR 366 *with* AR 570. Specifically, a 35 degree reduction in extension, a 15 degree reduction of lateral flexion on the left, and a 30 degree reduction of bilateral rotation. *See* AR 570.

Third, the September 2017 MRI of Ms. Grant's cervical spine revealed evidence of "[s]traightening of the cervical lordosis with multilevel degenerative disease and facet arthrosis . . . at the C6-C7 with moderate bilateral neural foraminal narrowing and moderate central stenosis." AR 949–50. Again, the ALJ failed to explain how this medical evidence either supported or contradicted Dr. Nolte's opinion regarding Ms. Grant's limitation in head movement, as well as the ALJ's decision to afford that opinion less weight. *See* AR 64.

"[A]n ALJ cannot merely disregard evidence which does not support [her] conclusion. A reviewing court should not be left guessing as to how the ALJ evaluated probative material, and it is reversible error for an ALJ to fail . . . to explain sufficiently the weight [s]he has given to certain probative items of evidence." *Turner v. Astrue*, 710 F. Supp. 2d 95, 105 (D.D.C. 2010) (first citing *Dionne v. Heckler*, 585 F. Supp. 1055, 1060 (D. Me. 1984); and then citing *Martin v. Apfel*, 118 F. Supp. 2d 9, 13 (D.D.C. 2000)). Yet the ALJ's decision failed to reference Dr. Nolte's examination or explain how the findings from the examination contradicted the opinion that Ms. Grant had a moderate limitation in head movements. *See* AR 64. This distinguishes Dr. Nolte's opinion from those in cases where the ALJ highlighted an internal inconsistency within the treating physician's own opinion when deciding to afford that opinion less weight. *See, e.g.*, *Turner v. Colvin*, 964 F. Supp. 2d 21, 31–33 (D.D.C. 2013) (finding substantial evidence supported the

ALJ's rejection of a treating physician's opinion because it conflicted with other medical evidence, including that physician's own treatment notes).

Courts have affirmed an ALJ's decision to give little weight to treating physicians where the evidence showed their "ability to perform daily activities, such as taking personal care, preparing simple meals, and shopping in stores independently." *Magee v. Berryhill*, No. 17-cv-1922, 2019 WL 329571, at *4 (D.D.C. Jan. 25, 2019). The ALJ's decision does reference Ms. Grant's ability to "able to dress, bathe, groom herself, cook, prepare food, do general cleaning, laundry, shop, manage her money and use public transportation without help," but only in connection with Ms. Grant's own "statements about the intensity, persistence, and limiting effects of her symptoms," not Dr. Nolte's opinion. AR 66. And—unlike in *Magee*—the ALJ did not also "review[] other medical examinations of Plaintiff, all of which contradicted [the physician's] limitation findings." 2019 WL 329571, at *4. Finally, the ALJ's decision does not make clear whether—and, if so, how—Ms. Grant's daily activities alone are at all inconsistent with a finding of a moderate limitation in head movements. *See* AR 64, 66; *Outlaw v. Sec'y, Dep't of Health & Hum. Servs.*, No. 92-cv-2089, 1994 WL 149134, at *6 (D.D.C. Mar. 29, 1994) (remanding where the ALJ found "Plaintiff's participation in certain daily activities" to be "inconsistent with the treating physicians' diagnosis," but the ALJ failed to "adequately explain[] his reasons for rejecting the opinions"). The ALJ failed to "build 'an accurate and logical bridge from the evidence to [her] conclusion' so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Lane-Rauth*, 437 F. Supp. 2d at 67 (citing *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).

This case is also distinguishable from those cases in which "it is clear from the ALJ's decision as a whole . . . why the ALJ found [the physician]'s opinion to be not well-supported and

14

inconsistent with other evidence in the record." *Grant*, 857 F. Supp. 2d at 153.  Here, the ALJ failed to make any "explicit comparison." *Id.* at 153; *see* AR 64.  Moreover, it is unclear how the ALJ concluded that Dr. Nolte's "clinical examination findings do not record abnormal range of motion of the cervical spine or upper extremities" or why there was "no support in the record for limitations for head movements." AR 64.  While the ALJ mentioned Ms. Grant's daily activities, nowhere does the ALJ cite any evidence from the record that—on its face—contradicts Dr. Nolte's opinion. *See* AR 66.  Thus, the ALJ did not "provide a sufficient basis for this Court to understand [her] reasoning when viewing the decision as a whole." *Colter v. Kijakazi*, No. 20-cv-0632, 2022 WL 715218, at *11 (D.D.C. Mar. 10, 2022).

3. *Remand to the ALJ for Reweighing of Dr. Nolte's Opinion*

Because the ALJ's mistake left the factual record less than fully developed, reversal with an instruction to award benefits would be inappropriate. *Cf. Martin*, 118 F. Supp. 2d at 18.  Rather, the SSA's decision should be reversed and remanded with instructions to properly consider Dr. Nolte's opinion with reference to the medical evidence from the examinations of Ms. Grant's cervical spine.  *See Jones*, 647 F.3d at 357.  If the ALJ determines that Dr. Nolte is a "treating physician," her opinion that Ms. Grant had a moderate limitation in head movements is "entitled to 'controlling weight' if [it is] not inconsistent with other substantial record evidence and [is] well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Butler*, 353 F.3d at 1003 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).  Alternatively, the ALJ may determine that Dr. Nolte was not a treating physician.[5]  *See, e.g.*, *Moore v. Berryhill*, 313 F. Supp.

---

[5] In particular, the ALJ should consider the nature and extent of the relationship under 20 C.F.R. § 404.1527(a)(2) given that Dr. Nolte's report stated Ms. Grant was "referred by the Disability Determination Division for an internal medicine evaluation," AR 568, and that she "was examined for a consultative examination. No doctor-patient relationship exists or is implied by this examination," AR 571.

3d 275, 284 (D.D.C. 2018); *Johnson v. Colvin*, 197 F. Supp. 3d 60, 74 (D.D.C. 2016).  Ultimately, the ALJ may reach the same conclusion as before.  But whatever her conclusion is, the ALJ must "show [her] work."  *Revere v. Berryhill*, No. 3:17-cv-774, 2019 WL 99303, at *9 (E.D. Va. Jan. 3, 2019) (citing *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017)).

B. <u>VE's Testimony</u>

"If the ALJ looks to a [VE] in assessing a claimant's ability to do other work, the ALJ 'must accurately describe the claimant's physical impairments in any question posed to the expert.'"  *Butler*, 353 F.3d at 1005–06 (quoting *Simms*, 877 F.2d at 1050) (citing *Williams*, 997 F.2d at 1499).  "Hypothetical questions to a [VE] 'must present a faithful summary of the treating physician's diagnosis unless the ALJ provides good reason to disregard that physician's conclusions.'"  *Espinosa v. Colvin*, 953 F. Supp. 2d 25, 35 (D.D.C. 2013) (quoting *Lockard v. Apfel*, 175 F. Supp. 2d 28, 32 (D.D.C. 2001).  "Deficiencies in the ALJ's description of the claimant's condition 'undermine the foundation for the expert's ultimate conclusion that there are alternative jobs' that the claimant is capable of performing."  *Butler*, 353 F.3d at 1005–06 (quoting *Simms*, 877 F.2d at 1053) (citing *Williams*, 997 F.2d at 1499).

During the administrative hearing, the ALJ posed the following hypothetical to the VE:

> Let's assume a hypothetical individual of claimant's age, education, and past work. Let's further assume that this individual is limited to light work . . . Let's further assume that this individual is limited to occasional climbing of ramps and stairs, never climbing ladders, ropes, or scaffolding, occasional stooping, and crouching, but no kneeling, and no crawling. This individual is limited to work in unprotected heights, or with moving mechanical parts, or operating a motor vehicle. This individual is limited to simple, routine tasks and can make simple, routine work-related decisions. The individual is limited to occasion interaction with social – supervisors, coworkers, and the public. And can tolerate occasional changes in a routine work setting. Can the hypothetical individual perform past work as actually or generally performed in the national economy?

AR 32. In response to the ALJ's question, the VE determined that a hypothetical individual with Ms. Grant's characteristics could not perform any relevant past work, but identified several occupations in the national economy that they could perform. *See* AR 33.

However, given the ALJ's determination that there was "no support in the record for limitations for head movements," AR 64, the ALJ did not include this limitation in the hypothetical posed to the VE. Ms. Grant argues that this absence made the hypothetical defective. *See* Pl.'s Mot. J. Rev. at 9.

The Court cannot conclude whether the hypothetical posed to the VE accurately reflected Ms. Grant's physical limitations without first determining whether Ms. Grant's RFC should have included a moderate limitation in head movements. Accordingly, upon remand, the ALJ will conclude either: (1) the RFC should not have included a moderate limitation in head movements, in which case no amendment to the ALJ's hypothetical is needed; or (2) the RFC needs to include such limitation, in which case—if the ALJ elects to call a VE—the ALJ must pose a revised hypothetical referencing that additional limitation.

### IV.    CONCLUSION

For the foregoing reasons, it is this 26th day of July, 2022,

**ORDERED** that Plaintiff's motion for a judgment of reversal is **GRANTED** and this matter is remanded to the Commissioner for further proceedings consistent with this opinion, and it is further

**ORDERED** that the Defendant's motion for a judgment of affirmance is **DENIED**.

ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE